J. S69016/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
MONTEZ BETHEA, : No. 2967 EDA 2013
:
Appellant :


Appeal from the Judgment of Sentence, September 11, 2013,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0009460-2011


BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., AND STABILE, J.


MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED DECEMBER 23, 2014**

Appellant, Montez Bethea, appeals from his judgment of sentence entered by the Court of Common Pleas of Philadelphia following a bench trial before the Honorable Glenn B. Bronson. Appellant was convicted of two counts of first degree murder and related offenses. The trial court imposed the mandatory sentence of life in prison for each murder charge to run consecutive to one another. We affirm.

Preliminarily, we must address the facially untimely filing of the notice of appeal. Post-sentence motions were filed and denied on September 20, 2013. Because the 30th day to file the notice of appeal fell on Sunday, October 20, 2013, appellant had until Monday, October 21, 2013 to file his appeal. *See* Pa.R.A.P., Rule 903(a), 42 Pa.C.S.A.; 1 Pa.C.S.A. § 1908. Appellant filed his notice of appeal on October 22, 2013.

On December 20, 2013, this court issued a rule to show cause why the appeal should not be quashed as untimely. On January 3, 2014, appellant's counsel filed his response in the form of a petition to show cause why notice of appeal should be deemed timely and should not be quashed. Counsel noted the following docket entry of the Philadelphia Court Criminal Electronic Filing System: "09/23/13 Order Denying Motion for New Trial." Counsel proceeded to electronically file his notice of appeal, via the electronic filing system, on October 22, 2013. Attached to his notice of appeal was a copy of the electronic filing system sheet which indicated the order denying motion for a new trial was filed on September 23, 2013. (Certified record, document #18.)

The paper docket entry in the official record lists the order denying motion for a new trial as filed on September 20, 2013. Thus, this case presents two conflicting dockets that yield different results when the timeliness of appellant's notice of appeal is analyzed. Pursuant to the online docket, the 30th day in which to file his appeal was October 23, 2013, and appellant's appeal is timely. Pursuant to the paper docket, the appeal period expired on October 21, 2013, and appellant's notice of appeal is untimely. We find that this dichotomy must be resolved in appellant's favor. **See Calabrese v. Zeager**, 976 A.2d 1151, 1153 (Pa.Super. 2009) (where there was a conflict between court's internet and paper dockets and appellants relied on errors contained in flawed docket published by county, we granted

equitable relief through an appeal *nunc pro tunc*).  Therefore, we may proceed to review appellant's appeal on the merits and will not quash it for untimeliness.

The trial court opinion sets forth the relevant facts and procedural history of this case.  Therefore, we have no need to restate them here.

Appellant raises the following issues for our review:

> I.    Is the Defendant entitled to an arrest of judgment on each of two Counts of First Degree Murder where the evidence is insufficient to sustain the verdict?
>
> II.   Is the Defendant entitled to a new trial on each of two Counts of First Degree Murder where the verdict is not supported by the greater weight of the evidence?

Appellant's brief at 3.

After a thorough review of the record, appellant's brief,[1] the relevant law, and the well-reasoned opinion of the trial court, we hold the sufficiency and weight arguments proffered by appellant are without merit.  The trial court's opinion carefully addresses and correctly disposes of the sufficiency and weight claims raised before it by appellant.  Accordingly, we dispose of appellant's issues on the basis of that opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2014

---

[1] The Commonwealth filed a brief in which it relied on the trial court's opinion.

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

v.

MONTEZ BETHEA

CP-51-CR-0009460-2011

FILED
DEC 0 6 2013
Criminal Appeals Unit
First Judicial District of PA

CP-51-CR-0009460-2011 Comm. v. Bethea, Montez
Opinion

7093706941

BRONSON, J.                                             December 6, 2013

On September 11, 2013, following a non-jury trial before this Court, defendant Montez

Bethea was convicted of two counts of first-degree murder (18 Pa.C.S. § 2502(a)), two counts of

criminal conspiracy (18 Pa.C.S. § 903), two counts of first-degree robbery (18 Pa.C.S. §

3701(a)(1)(i), one count of carrying a firearm without a license (18 Pa.C.S. § 6106(a)(1)), one

count of carrying a firearm on public streets of Philadelphia (18 Pa.C.S. § 6108), one count of

possessing a controlled substance with intent to deliver (75 Pa.C.S. § 780-113(a)(30)), and one

count of possessing an instrument of crime (18 Pa.C.S. § 907(a)). The Court immediately

imposed the mandatory sentence of life in prison for each murder charge, to run consecutive to

one another (18 Pa.C.S. § 1102(a)(1)). Defendant filed post-sentence motions, which the Court

denied on September 20, 2013.

Defendant has now appealed from the judgment of sentence entered by the Court on the

grounds that: 1) the evidence was insufficient to support the verdict; and 2) the verdict was

against the weight of the evidence. Statement of Matters Complained of Pursuant to Rule of

Appellate Procedure 1925(b) ("Statement of Errors") at ¶¶ 1-2. For the reasons set forth below,

Defendant's claims are without merit and the judgment of sentence should be affirmed.

LOWER COURT OPINION

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Shonte Smith, Lester Johnson, William Whitehouse, Patricia Guy, Darryl Rigney, Philadelphia Police Officers Charles Kapusniak, Joseph McCabe, Joseph McCauley, Stephen Ratka, Lamont Fox, Reginald Forrest, Jr., and Kenneth Long, Philadelphia Police Detectives Gregory Rodden and Micah Spotwood, Philadelphia Police Corporal Gerard Mertz, Philadelphia Police Captain James Smith, and, by stipulation, the testimony of Dr. Gary Lincoln Collins and Officer Ken Weitman. Co-defendant James presented the testimony of Kuzell Bivins and Tyrik Lark. Viewed in the light most favorable to the Commonwealth as the verdict winner, their testimony established the following.

On December 8, 2010, at approximately 11 a.m., defendant Bethea called a friend, Darryl Rigney, and asked him to accompany defendant to buy marijuana. N.T. 9/10/2013 at 115-116. Mr. Rigney said yes, and defendant drove to Mr. Rigney's house in a Crown Victoria. N.T. 9/10/2013 at 116. After he arrived at Mr. Rigney's house, defendant told Mr. Rigney to drive to Mr. James's house, because Mr. James knew people who sold marijuana. N.T. 9/10/2013 at 116. Mr. Rigney drove defendant to Mr. James's house in the Crown Victoria. N.T. 9/10/2013 at 116. When they arrived at the house, defendant got out of the car, met Mr. James at the door, and went inside for a few minutes. N.T. 9/10/2013 at 116-117. The two men then returned to the Crown Victoria in which Mr. Rigney was waiting. N.T. 9/10/2013 at 117.

Once in the car, Mr. James began calling his drug supplier, Jemark Daniel. N.T. 9/10/2013 at 117-120. Mr. Daniel did not answer the phone. N.T. 9/10/2013 at 117. Mr. James then called a friend, Robert Williams, and told him to meet Mr. James at 17th Street and Fairmount Avenue. N.T. 9/10/2013 at 117-119. At that point, Mr. Daniel called Mr. James back and told him that he could come by Mr. Daniel's apartment to buy marijuana. N.T. 9/10/2013 at

2

119. Mr. Rigney then drove the three men to 17th Street and Fairmount Avenue, where Mr. Williams was waiting. N.T. 9/10/2013 at 120. Mr. Williams had a white Cadillac with him. N.T. 9/10/2013 at 120. Mr. James, defendant, and Mr. Rigney got into the white Cadillac, while Mr. Williams took the Crown Victoria. N.T. 9/10/2013 at 120.

Mr. Rigney drove the white Cadillac to 3001 Redner Street, where Mr. Daniel lived. N.T. 9/10/2013 at 120. Mr. James and defendant got out of the car and went into Mr. Daniel's apartment. N.T. 9/10/2013 at 121-122. Upon entering the apartment, Mr. James and defendant shot and killed Mr. Daniel and his girlfriend, Patranella London, and stole his marijuana and passports from the apartment. Mr. James and defendant then fled the apartment, running back to the Cadillac with a large black garbage bag. N.T. 9/10/2013 at 122. As Mr. Rigney drove the car away from the apartment building, Mr. James said to Mr. Rigney, "I took his shit." N.T. 9/10/2013 at 160.

Mr. Daniel's neighbor, Lester Johnson, heard the gunshots and looked out his window. N.T. 9/10/2013 at 10. He saw the white Cadillac speed off from Mr. Daniel's apartment. N.T. 9/10/2013 at 10. Mr. Johnson wrote down what he could see of the license plate number, which was "HP 7-27." N.T. 9/10/2013 at 11-14. A friend who was with Mr. Johnson called 911, and the police arrived on the scene. N.T. 9/10/2013 at 12, 40, 89. Upon entering the apartment and seeing the bodies of Mr. Daniel and Ms. London, it was immediately apparent to police officers that they were both dead. N.T. 9/10/2013 at 40-41. The paramedics arrived and pronounced both victims. N.T. 9/10/2013 at 41. Mr. Daniel had been shot ten times: twice in the chest, twice in the stomach, four times in the left arm, once in the left thigh, and once in the right thigh. N.T. 9/9/2013 at 160-161. Ms. London had been shot thirteen times: eight times in the back, three times in the left thigh, once in the left arm, and once in the left leg. N.T. 9/9/2013 at 161.

3

At the same time, Philadelphia Police Officer Charles Kapusniak and his partner, Kenneth Long, were conducting surveillance on the 1800 block of North Judson Street, pursuant to their assignment with the Narcotics Field Unit. N.T. 9/9/2013 at 94. This location was near Redner Street, where the murders had just occurred. At approximately 2:40 p.m., Officer Kapusniak observed a white Cadillac travel southbound on Judson Street before pulling over near 1820 North Judson Street. N.T. 9/9/2013 at 95. Officer Kapusniak saw Darryl Rigney exit the vehicle's driver door, while Mr. James emerged from the front passenger seat and defendant got out of the rear passenger seat. N.T. 9/9/2013 at 95-96. All three men then walked to the rear of the Cadillac, and Mr. James removed a large trash bag from the Cadillac's trunk. N.T. 9/9/2013 at 96. The three men then ran into 1820 North Judson Street. N.T. 9/9/2013 at 96.

Thirty seconds after the three men ran into the house on North Judson Street, Officer Kapusniak received a call over police radio from Philadelphia Police Lieutenant James Smith. N.T. 9/9/2013 at 96, 123. Lieutenant Smith informed Officer Kapusniak that there had been a shooting at 3001 Redner Street, and that a white Cadillac containing two or three black males had been seen fleeing the scene. N.T. 9/9/2013 at 96, 123-125; 9/10/2013 at 16-17. Officer Kapusniak radioed for backup, informing Lieutenant Smith that he had just seen a white Cadillac and that three black males had emerged from the Cadillac and run into a house. N.T. 9/9/2013 at 96-97, 199.

Approximately one minute after he radioed for backup, Officer Kapusniak observed two men, later identified as Reginald Andrews and Maurice Morris, walk past his vehicle. N.T. 9/9/2013 at 97-98. Mr. Andrews and Mr. Morris approached 1820 North Judson Street, knocked on the door, and entered the house. N.T. 9/9/2013 at 98. Mr. James then stuck his head out of the door and looked around. N.T. 9/9/2013 at 98. A short time later, a silver Kia sped down the

4

block and parked in the middle of the street in front of the house. N.T. 9/9/2013 at 98-99. Mr. James then ran out of the house, carrying a black duffle bag. N.T. 9/9/2013 at 99. He jumped into the passenger seat of the Kia and threw the duffle bag into the backseat. N.T. 9/9/2013 at 99. The driver of the Kia, later identified as Mohammed Bey, drove down Judson Street at a high rate of speed and turned down Montgomery Avenue, at which point Officer Kapusniak lost sight of the vehicle. N.T. 9/9/2013 at 99-100, 120-121.

After Mr. Bey turned onto Montgomery Avenue, Officer Joseph McCabe and Officer Miles, who were backing up Officer Kapusniak, pulled over the silver Kia based on Officer Kapusniak's description of the car and its license plate number. N.T. 9/9/2013 at 99-100, 163-165.[1] As Officer McCabe approached the passenger side of the vehicle, the passenger door popped open, and Officer McCabe smelled an extremely strong odor of marijuana emanating from the car. N.T. 9/9/2013 at 165. Officer McCabe opened the passenger door the rest of the way, and Mr. James, who was in the passenger seat, immediately said, "Officer, that's my marijuana." N.T. 9/9/2013 at 165-166. Officer McCabe placed Mr. James and Mr. Bey in custody and searched Mr. James's pants pockets, recovering $555 cash. N.T. 9/9/2013 at 166-167, 179-180. Officer McCabe then saw the duffle bag in the backseat, which was open. N.T. 9/9/2013 at 167. The bag contained five clear Ziploc bags of marijuana and a scale. N.T. 9/9/2013 at 167. Officer McCabe radioed Officer Kapusniak and told him that he had apprehended Mr. James and Mr. Bey, and that he had recovered several clear Ziploc bags of marijuana from the duffle bag in the backseat of the Kia. N.T. 9/9/2013 at 100.

While Officer McCabe was apprehending Mr. James and Mr. Bey, Officer Kapusniak had remained at 1820 North Judson Street, surveilling the house. N.T. 9/9/2013 at 100-101.

---

[1] Officer Miles's first name was not given at trial.

5

Officer Kapusniak observed Mr. Andrews and Mr. Morris emerge from the house. N.T. 9/9/2013 at 100. Mr. Andrews had a white plastic bag in his hand. N.T. 9/9/2013 at 100. Officer Kapusniak again radioed backup officers and gave them a description of Mr. Andrews and Mr. Morris. N.T. 9/9/2013 at 100. Mr. Andrews and Mr. Morris walked up the block, turning onto Berks Street. N.T. 9/9/2013 at 101.

After Mr. Andrews and Mr. Morris turned onto Berks Street, Officer Joseph McCauley and Officer Aponte began pursuing Mr. Andrews and Mr. Morris on foot, based on the descriptions relayed to them by Officer Kapusniak. N.T. 9/9/2013 at 101.[2] Mr. Morris did not run from the police, and was placed in custody. Mr. Andrews fled, throwing the white plastic bag that he had been carrying over a fence. N.T. 9/9/2013 at 101. Officer McCauley caught up to Mr. Andrews and placed him under arrest. N.T. 9/9/2013 at 191. Officer McCauley then jumped over the fence and retrieved the bag that Mr. Andrews had discarded. N.T. 9/9/2013 at 191. In the bag were a clear Ziploc bag full of marijuana, several empty bags with marijuana residue, a gun holster, a photograph album, and two passports. The passports were later discovered to belong to Mr. Daniel, one of the homicide victims. N.T. 9/9/2013 at 192; 9/10/2013 at 21-22; 9/11/2013 at 85-89.

As Officer McCauley was apprehending Mr. Andrews and Mr. Morris, Officer Kapusniak continued his surveillance of 1820 North Judson Street. N.T. 9/9/2013 at 103. Lieutenant Smith, along with Philadelphia Police Corporal Gerard Mertz and other members of the narcotics team, arrived at the house and informed Officer Kapusniak that two people had been killed in the shooting at 3001 Redner Street. N.T. 9/9/2013 at 103. At that point, the officers heard movement from inside 1820 North Judson Street, and Corporal Gerard Mertz ordered the officers to enter the house in order to secure the property. N.T. 9/9/2013 at 202-203.

[2] Office Aponte's first name was not given at trial.

Corporal Mertz, Lieutenant Smith, Officer Kapusniak, Officer Long, and Officer Stephen Ratka entered the house. N.T. 9/9/2013 at 103, 200.

As police entered the house, defendant and Mr. Rigney were sitting in the living room along with a young woman, later identified as Shonte Smith. N.T. 9/9/2013 at 104, 203. Mr. Rigney was sitting in a chair by the front door, while defendant was sitting on a couch on the opposite side of the room. N.T. 9/9/2013 at 40, 104, 226. Next to defendant was a dog cage, on top of which was an unzipped duffle bag. N.T. 9/9/2013 at 104. Inside that duffle bag, clearly visible to the police, were clear Ziploc bags full of marijuana. N.T. 9/9/2013 at 104, 148. Defendant, Mr. Rigney, and Ms. Smith were all placed in custody. From Mr. Rigney's pocket, Officer Ratka recovered the key to the white Cadillac. N.T. 9/9/2013 at 109, 152, 226.

Police performed a protective sweep of the property for other suspects, and awaited a search warrant in order to further search the property. N.T. 9/9/2013 at 104-105, 149, 200, 221; 9/10/2013 at 19-21. As police awaited the warrant, Ms. Smith was sitting in a chair and defendant and Mr. James were sitting on the floor. N.T. 9/10/2013 at 41-42. All three were handcuffed. N.T. 9/9/2013 at 41-43. As he sat on the floor in handcuffs, defendant kicked a pink bag underneath the couch. N.T. 9/10/2013 at 43-44.

After obtaining a search warrant, police searched the entire residence. N.T. 9/9/2013 at 105-106. Police recovered seven clear Ziploc bags full of marijuana from within the open duffle bag and five clear Ziploc bags full of marijuana from within a white trash bag. N.T. 9/9/2013 at 106, 240. Police also recovered the pink bag from underneath the couch, which contained a .357 revolver, a 9-millimeter handgun, and a .45 caliber handgun. N.T. 9/10/2013 at 66.

Police recovered 25 pieces of ballistics evidence from the scene of the murders: eighteen fired cartridge casings and projectiles from a 9-millimeter handgun, four fired cartridge casings

7

from a .45 caliber handgun, two bullets from a .357 revolver, and one bullet jacket of indeterminable caliber. N.T. 9/10/2013 at 66-68. The Firearms Unit matched 11 of the fired cartridge casings to the 9-millimeter gun recovered from the pink bag found in 1820 North Judson Street, one of the fired cartridge casings to the .45 caliber handgun found in the pink bag, and both of the .357 bullets to the .357 revolver found in the pink bag. N.T. 9/10/2013 at 70-71. The medical examiner recovered three 9-millimeter bullets from Ms. London's body, and one 9-millimeter bullet and one .45 caliber bullet from Mr. Daniel's body. N.T. 9/10/2013 at 69. The .45 caliber bullet removed from Mr. Daniel's body was matched to the .45 caliber handgun from the pink bag. N.T. 9/10/2013 at 70.[3]

After obtaining a search warrant for the Cadillac, the police recovered from its trunk the license plate that was registered to the car, which read "HJZ-1543." N.T. 9/10/2013 at 27. The license plate that was affixed to the Cadillac, which was not registered to the car, read "HPG-2737." N.T. 9/10/2013 at 25-26.

The marijuana recovered from 1820 North Judson Street, the marijuana recovered from the Kia, and the marijuana that Mr. Andrews attempted to discard over a fence were all "hydroponic" marijuana, which is a particularly expensive, powerful, and pungent-smelling form of the drug. N.T. 9/10/2013 at 14, 56. All of this marijuana was identical to the small amount of marijuana that was left behind in the apartment at 3001 Redner Street. N.T. 9/10/2013 at 56.

---

[3] The remaining 9-millimeter and .45 caliber fired cartridge casings and bullets were consistent with the 9-millimeter handgun and the .45 caliber handgun recovered from the bag, but had insufficient markings to positively match the casings to the firearms. N.T. 9/10/2013 at 71.

8

## II. DISCUSSION

*A. Sufficiency of the Evidence*

Defendant claims that he "must be awarded an arrest of judgment on all charges, including murder in the first degree, criminal conspiracy, robbery and related offenses, as there was insufficient evidence to sustain the verdict. More specifically, the Commonwealth did not prove that the Defendant was the perpetrator of the crimes, nor a criminal conspirator, nor an accomplice. With regard to murder in the first degree, the Commonwealth did not prove specific intent to kill, malice, nor premeditation." Statement of Errors at ¶ 1. These claims are without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the fact-finder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (quoting *Commonwealth v. Brumbraugh*, 932 A.2d 108, 109 (Pa. Super. 2007)). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "[A] mere conflict in the testimony of the witnesses does not render the evidence insufficient..." *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa. Super. 1998). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Ramtahal*, 33 A.3d at 607. "If the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001)).

9

1. Identification

Defendant's first claim regarding the sufficiency of the evidence is that the evidence failed to establish that he was the perpetrator of the crimes of which he was convicted. Statement of Errors at ¶ 1. The standard governing the sufficiency of identification evidence is well-established: absent a tainted identification procedure, "the Commonwealth's burden is simply to introduce evidence solid enough to avoid conjecture." *Commonwealth v. Hurd*, 407 A.2d 418, 422 (Pa. Super. 1979). Identification testimony need not be positive, and indefiniteness or uncertainty in the testimony goes to its weight and not its sufficiency. *Commonwealth v. Hickman*, 309 A.2d 564, 566 (Pa. 1973); *Commonwealth v. Cain*, 906 A.2d 1242, 1245 (Pa. Super. 2006), *appeal denied*, 916 A.2d 1101 (Pa. 2007); *Commonwealth v. Mason*, 236 A.2d 548 (Pa. Super. 1967). The test is whether the evidence, viewed in the light most favorable to the Commonwealth, and accepting all reasonable inferences therefrom, could enable the factfinder to conclude that the defendant was the perpetrator. *Hickman*, 309 A.2d at 566.

Here, there was substantial testimonial evidence from which a reasonable juror could conclude that defendant committed the crimes of which he was convicted. Darryl Rigney, who had known defendant for 20 years, testified to defendant's involvement in the killing. Mr. Rigney testified that, after Mr. James talked to Mr. Daniel about purchasing marijuana, defendant, Mr. James, and Mr. Rigney switched cars with another man and drove to Mr. Daniel's apartment in a white Cadillac. N.T. 9/10/2013 at 115-120. Mr. Rigney testified that defendant and Mr. James went inside Mr. Daniel's apartment and, a few minutes later, ran from the apartment to the car carrying a large garbage bag. N.T. 9/10/2013 at 122. Lester Johnson testified that, at the same time, he heard gunshots and saw a white Cadillac fleeing the scene.

10

N.T. 9/10/2013 at 10. Officer Kapusniak testified that, as he performed unrelated narcotics surveillance near the scene of the murders, he observed three black men, including defendant, pull up in front of a house in a white Cadillac, remove a large bag from the car's trunk, and run inside the house. N.T. 9/9/2013 at 95-96. Officer Kapusniak also testified that he had a clear, unobstructed view of the front of the house from his patrol vehicle. N.T. 9/9/2013 at 110-111. This testimony was compelling evidence from which the Court, as factfinder, could conclude that defendant committed the murders.

Likewise, there was strong physical evidence that proved that defendant was the perpetrator of the crimes. Officer Kapusniak testified that, after police entered the house in which defendant was hiding after the murders, defendant and Mr. Rigney were sitting in the living room and that next to defendant was an unzipped duffle bag containing clear Ziploc bags full of marijuana. N.T. 9/9/2013 at 104, 148. Ms. Smith testified that, as police awaited the warrant, she, defendant, and Mr. Rigney were all placed in handcuffs as they sat in the living room. As she sat in a chair approximately four feet away from defendant, she saw him kick a pink bag underneath the couch. N.T. 9/10/2013 at 41-44. The stipulated testimony of Officer Ken Weitman established that this bag contained the murder weapons, as the guns were matched to the ballistics found at the crime scene and recovered from the body of one of the victims. N.T. 9/10/2013 at 66-71. Officer McCauley testified that a man leaving the house in which defendant was found was in possession of a bag containing passports belonging to Mr. Daniel. N.T. 9/9/2013 at 192. Further, the marijuana recovered from the bag found next to defendant at the time of his arrest matched the specific type of marijuana found at the scene of the murders. N.T. 9/10/2013 at 56. This was overwhelming evidence that defendant committed the crimes of which he was convicted.

11

## 2. Specific Intent to Kill

Defendant also claims that there was insufficient evidence to prove that he acted with the requisite intent to commit first-degree murder. Statement of Errors at ¶ 1. The evidence is sufficient to establish first-degree murder "where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill." *Commonwealth v. Bedford*, 50 A.3d 707, 711 (Pa. Super. 2012), *appeal denied*, 57 A.3d 65 (Pa.) (quoting Pa.C.S. § 2502(a)). The specific intent to kill can be inferred "from the manner in which the homicide was committed, such as, multiple gunshot wounds." *Commonwealth v. Hughes*, 865 A.2d 761, 793 (Pa. 2004). Moreover, specific intent to kill may be inferred from a defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Robertson*, 874 A.2d 1200, 1207 (Pa. Super. 2005). To be guilty of first-degree murder, a defendant who is member of a conspiracy to commit murder need not commit the act that results in the death of the defendant since all members of a conspiracy are "liable for the actions of the others if those actions were in furtherance of the common criminal design." *Commonwealth v. King*, 990 A.2d 1172, 1178 (Pa. Super. 2010).

Here, there was compelling evidence that defendant acted with the specific intent to kill. The stipulated testimony of the medical examiner established that Mr. Daniel was shot ten times and Ms. London was shot thirteen times, by two different guns. N.T. 9/9/2013 at 160-161. The crime scene investigator testified that 25 pieces of ballistics evidence were recovered from the crime scene. N.T. 9/10/2013 at 52-71. Further, Mr. Rigney testified that, when he, defendant, and Mr. James were surveying the proceeds of the robbery, Mr. James asked defendant whether he "finish[ed]" Ms. London, to which defendant responded, "[g]uaranteed." N.T. 9/10/2013 at 126. All of this was compelling evidence that defendant acted with the specific intent to kill Mr.

12

Daniel and Ms. London when he repeatedly shot them. Accordingly, the evidence was plainly sufficient to support the jury's verdict of first-degree murder.

### B. *Weight of the Evidence*

Defendant claims that "the verdict is not supported by the greater weight of the evidence. Rather, the greater weight of the evidence did not establish that the Defendant was a principal, conspirator, nor an accomplice to any of the crimes charged. The greater weight of the evidence only established that the Defendant was in proximity to the proceeds of the crime, after the crime occurred. The verdict was based on speculation, conjecture, and surmise, which is not permissible." Statement of Errors at ¶ 2. This claim is without merit.

It is well-established that a new trial may only be granted by the trial court where the verdict was so contrary to the weight of the evidence as to "shock one's sense of justice." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004), *appeal denied*, 878 A.2d 864 (Pa. 2005) (quoting *Commonwealth v. Hunter*, 554 A.2d 550, 555) (Pa. Super. 1989)). Moreover, credibility determinations are solely within the province of the fact-finder, and "an appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact." *Commonwealth v. Taylor*, 63 A.3d 327 (Pa. Super. 2013) (quoting *Commonwealth v. Shaffer*, 40 A.3d 1250, 1253 (Pa. Super. 2012)). In considering a claim that the trial court erred in refusing to find that a verdict was against the weight of the evidence, "appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Taylor*, 63 A.3d at 327 (quoting *Shaffer*, 40 A.3d at 1253).

The overwhelming evidence outlined above plainly established that defendant committed the crimes of which he was convicted. Because the evidence fully supported the verdict, the Court did not abuse its discretion in denying defendant's motion for a new trial.

13

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

14